## HELEN JACOBS et al. v. MYRTLE MELTON.

Eastern Section. January 7, 1928.

Petition for Certiorari denied by Supreme Court, April 14, 1928.

H. T. Poore and J. Fred Bibb, of Knoxville, for plaintiff.
Kennerly & Key, of Knoxville, for defendant.

SNODGRASS, J. This is a personal injury case, and the parties will be referred to as they were styled below.

The plaintiff, Myrtle Melton, was the injured party. Her declaration, containing two courts, was filed against three persons. The father, Elvert V. Jacobs, was made party defendant with the idea of a liability against him under the doctrine of family use, but later a non-suit was taken as against him, and the case prosecuted

against his two children, Helen Jacobs and Melvin Jacobs, Helen owning the automobile, which was being driven by her brother Melvin upon her business.

The first count substantially alleges that on August 25, 1925, at about eight o'clock in the morning as she was going to her work and expecting to board a street car on Magnola avenue, a double track street, and while crossing said avenue from its south to its north side, at the usual place of such crossing at its intersection with Ivy avenue, after she had passed the center of said street, the defendant Melvin P. Jacobs wrongfully, negligently and unlawfully propelled and operated an automobile owned by Helen Jacobs, and being operated by him in her business, into violent collision with the plaintiff, knocking and hurling her about 150 feet, rendering her unconscious and greatly wounding, bruising and injuring her in her head, body and limbs; that her nose was cut and broken, her face cut, bruised and injured, and her eyes wounded, bruised and injured; that her limbs were cut, gashed and bruised, as likewise were her arms; that she likewise received injuries to her heart, back and lungs; that she was further greatly shocked and has been rendered a nervous wreck as the result of said injuries, all of which were averred to be permanent in their character, and from which it is claimed that she suffered, and will hereafter suffer great physical pain and mental anguish.

It was averred that at the time of her injuries she was earning about $100 per month, and that as a result of said injuries she has been unable to do any substantial work since said time; and it was averred that owing to the permanent character of said injuries she will be unable to earn any considerable amount of wages in the future; that her doctors' bills, surgeon's bill, hospital and medical expenses incurred in the treatment of her said injuries amounted to more than $300, and that in her future treatment for said injuries she will incur considerable additional expense.

The declaration contained numerous specifications of negligence not necessary here and now to repeat, and though a part of the specifications relating to the wrongful and unlawful operation of the car at the rate of forty miles per hour and in violation of the statutes of the State of Tennessee limiting the speed to twenty miles per hour was withdrawn, sufficient allegations of negligence were left, as that now it is conceded in the brief what is otherwise very apparent, that these defendants were guilty of such negligence, and covered by the declaration, as proximately caused plaintiffs' injuries, though under other assignments the extent and character of the injuries are still in issue; as was also retained the insistence that plaintiff was proximately negligent, barring any recovery, or

at least guilty of such remote negligence as that the verdict and judgment is excessive.

As might be inferred from the foregoing the case was put at issue by a plea of not guilty, and culminated, notwithstanding an overruled motion for a directed verdict, in a finding and judgment in favor of the plaintiff. This verdict and judgment was for the sum of $5000, against both defendants, Helen and Melvin P. Jacobs, who, their motion for a new trial being overruled, have appealed to this court, making the following assignments of error.

"I.    There was no evidence to support the verdict."

"II.   The evidence greatly preponderates against the verdict."

"III.  The court erred in failing and refusing to grant defendants' motion for a directed verdict made at the close of all the proof introduced in the cause, as there was no evidence to support the verdict.

"IV.   The verdict was so grossly excessive as to indicate passion, prejudice or caprice on the part of the jury."

Taking up the assignments in their inverse order, we see no evidence of any passion, prejudice or caprice on the part of the jury in their disposition of this case. Plaintiff sued for ten thousand dollars, and their verdict has reduced the claim fifty per cent. In our analysis of the evidence we can see nothing in this amount other than compensation, which makes no reckoning of the financial standing of the defendants or the gross or malignant character of the wrong, which indeed, under the facts and circumstances of this case, they might have considered.

It is not material as to the length of time between the summons and the filing of the declaration, or as to its passage between this latter date and the trial. If defendants failed to avail themselves of any of the methods provided that might have secured a more expeditious disposition of the case, they must be held to have acquiesced in its dragging, and are not in a position to complain on that score. One mitigating circumstance of the delay, however, in any event, is that it has afforded the test of time as applicable to the extent of the injuries, relieving in a degree the investigation from embarrassment that might otherwise have attended its earlier termination. In addition to the severe suffering that plaintiff must have endured at first by being violently swept down, pushed and tumbled into the street by the impact of this flying automobile, it had not entirely ceased at the time of the trial, and continues a threat of further persistence. It is claimed that she had exaggerated her injuries. It may be, and it is quite natural, that they should have appeared to her more serious than to others, but the doctor's informed opinion and description of the injuries presents

them as sufficiently serious, we think, to justify the jury's verdict. Dr. Herbert Acuff, a man whom we should judge from his opportunities and reputation is thoroughly competent and calculated to understand and honestly represent the matter, was introduced and testified that—

"She had a cut, a contusion to her right elbow, and also to the nose, and her left hip, some lacerated places on her left hip, and two fractured ribs in her left chest; as well as I remember it was the seventh and eighth rib, that is the hospital record."

Asked about how long that cut on her hip was, he replied: "Well, there were a number of cuts."

"Q. How long were they up and down? A. You mean their lineal distance?

"Q. Yes. A. Two and three inches, they were not deep, lacerations, more in the nature of contusions.

"Q. That means a bruise? A. That means a severe bruise, the skin cut.

"Q. How about the injury to the left elbow and left arm? A. The left elbow had some contusions also, it was not bad as the right. The contusion on the left side was her chest.

"Q. You said which ribs were broken? A. I think the seventh and eighth, I would not be positive."

He testified that she had what they called a "green stick fracture," by which was meant that the two ends were not displaced; though broken they still hold together, just like you would take a green stick and break it in two, but would splinter it. He was asked:

"Q. How about those ribs pressing down on her lungs? A. They were and are yet pressing.

"Q. Is or not there any sunken places in the breast or just at that place where these ribs were broken? A. There is."

"Q. Was it there before the accident? A. Not that I know of.

"Q. Did you ever treat her before that and had any complaint from anything like that, any such injury? A. Not for that.

"Q. The depression where those ribs are—state whether or not that is a common result from broken ribs where they get hurt from a blow like that? A. Yes, sir, I should say, because in the chest that way it is difficult to get in and elevate them, pull them back up in line."

The Doctor testified that he tried to and thought he had given her the best treatment professionally for the injuries; that she suffered physical pain; that it was a very painful injury; that she had

bruises on her face and nose; that they thought the nose was broken for sometime, the bridge of the nose; that she had been under his and Dr. Kitts' care practically ever since that time, and was so at the present; that her nervous system was of course pretty badly shattered for several days; that she was apparently unconscious and did not recognize anyone for the period she stayed in the hospital, and after that as soon as they felt that she was rational, and no evidence of fracture—a fractional skull—they transferred her to her home on account of the expense, but that she had been more or less nervous ever since. The injury occurred in August, 1924, and this testimony was given on the trial in March, 1927.

Testifying further as to the effect of these and such injuries upon the nervous system, Dr. Acuff said:

"It is bound to be a terrific blow to the nervous system, to anybody, first the fright and, second, the impaction. She has got that type of injury."

"Q. Concussion from the blow? A. Yes sir."

He remembered that she went back to work in February, at his suggestion. He wanted to try her out and thought perhaps it would stabilize her nervous system if she could get some responsibility, and continued to examine and treat her during the period when she went back to work, but that she could not stand the work. He was further asked:

"Q. From your investigation and what you found, did you advise her to quit work? A. She came to the office carrying a pulse running around 130 or 135 or 140, and it was apparent that she could not stand very much physical endurance, and therefore I told her to quit.

"Q. What is normal for her pulse? A. Seventy-two.

"Q. It was running how high? A. Well, sometimes 140; I said 120 to 140.

"Q. Is high pulse evidence to you doctors of nervousness? A. It is.

"Q. And you have continued to treat her since that time? A. Yes sir.

"Q. State whether or not in your opinion these injuries were—injuries to her side and chest that you spoke about, were permanent or not? A. You mean the depression?

"Q. Yes. A. Yes sir, that is permanent.

"Q. On account of that pressure on the lungs, state whether or not she has full and free breathing capacity like a normal person would have? A. That would be calculated to impair her heart action.

"Q. How does it impair the heart action? A. Pressure limits the motion of the heart.

"Q. Is it or not a serious condition, to have that condition there? A. Well, it is not a very desirable injury to have about the chest anywhere.

"Q. Is it serious, or slight? A. Well, it wasn't a slight injury, no sir.

"Q. Is there anything now that medical science can do? A. Well, I don't think it would be advisable to attempt to elevate the ribs in there.

"Q. How would you attempt to if you did do it? A. An operation.

"Q. Cut in there? A. Yes sir.

"Q. Is that a dangerous operation, or not? A. It is in that particular area, because it is just over the heart."

The doctor's bill was shown by him to have been $325 as per statement rendered.

On cross-examination the doctor stated that the plaintiff would not qualify as a neurasthenic, that necessarily she had a depleted nervous system from the amount of shock and fright, etc., that she has endured. He said that she had considerable nervousness following the separation from her husband, but that she regained herself, went back to work, and worked for a year or two years before this accident happened; that neurosis was not hereditary. Asked if such an affair as she had with her husband would produce neurosis, he said: that it would produce nervousness; that it did at the time it happened; that was some years before; that while he thought at the time the nose was broken, they found out later it was not; that the X-ray did show two green stick fractures. He stated that the X-ray picture was at the Riverside Hospital and he thought it could be secured, but it is not in the record and does not appear to have been filed in the case.

In addition to describing her condition and sensations when she regained consciousness in the hospital, the plaintiff said, in relation to the injuries to her side or chest, that there was a soreness, she could not move either way; that she could not breathe very well; that it was painful, could not get her breath very well at all. Asked since she had gotten out of the hospital what condition she had there in the left chest at the place where the soreness was, with reference to being normal or different from the other, she said that it was not normal, that there was a considerable difference; that it was sunk in considerably, and that there seems to be pressure there that hinders her breathing; that she had a tenderness so deep that she could not feel it from touch, but could feel it in breathing, and that she had never been able to lie on her left side since she was hurt. She further testified that her eyes since that time had never been so she could read as well as before; that she suffered with

headache practically all the time; could read only a few minutes at a time, and that at times she could not read at all; that before this she was sound and well as far as she knew. Recurring to her left side she said: "I can't lie and sleep on my left side; when I go to sleep on my left side I cannot breathe, and I wake up in a nervous condition and mother has to work with me, and sister maybe an hour or so to get me quiet again. I have nervous chills."

She had been working as stenographer for the Maples Lumber Company, for seventeen months, during which time her salary had been raised from $50 to $75 per month, and later she was offered $130 by the Southern Railroad Company, if she could have accepted it. She was confined to her bed for about two months, was advised by her doctor to go back to work, which she did January 19, 1925, and worked part of the time until April 4th following, but quit on account of nervousness that had been caused by the injuries, and then was suffering physical pain from these injuries, and had not been able to go back to work as stenographer or otherwise since that time. It appears, as stated, that Dr. Acuff's bill was $325, that Dr. Kitts had also rendered a bill for $137.50, that the hospital bill had been $89.20 and that for medicine she had paid out $200, aggregating $751.70, and still medical expenses were being incurred.

The plaintiff after her divorce from her husband had prepared herself as a stenographer, to enable her to earn a living. She appears to have been capable, and her wages had been increased from $50 to $75, and the opportunity would have been open for a further increase. Without taking into consideration the off and on effort from January to April which she made in the demonstration of her incapacity to work at her profession, it is apparent that she has lost from this disability, which is in its nature permanent, something like two and a half years of time which with the expenses amounts to something over $3000. When it is taken into consideration that without risking her life in an operation her heart will remain thus fettered and disabled, entailing this consequence of nervousness and suffering throughout her life, which had a long expectancy, the evidence presents we think no question of prejudice, passion or caprice that would tincture the verdict with questionable integrity.

The verdict has also settled the question as to the claim of any contributory negligence barring a recovery, and if there was any remote negligence, we think also that it has been sufficiently atoned for in the size of the recovery. Apparently occupying an encroachment on the exempt side of the street, with his friend Simpson in front of him on his right, obstructing at least to some extent his ability to pass without driving upon the space reserved on the other side of the street for westbound traffic, or people who had a right

to be there, he approached this crossing, where he might reasonably have expected people to be, at an excelerated and negligent rate of speed, under which if dangers suddenly developed his car would not be under his control so as to avoid such an accident as did happen under the proof. He denies such rate of speed, but rather insists that he could have stopped, if necessary. His testimony is to the effect that, when plaintiff came out in front of him, though not seeing him, and with her attention occupied elsewhere, and while there was time to have stopped, he yet speculated at what she would do to give him the right of way, until on the discovery of her peril she was so shocked and frightened that she ran, and acted so as not to effect co-operation by her in what he claims was his efforts to pass her safely, and that he finally used the expediency on the brakes.

The way was open to him to stay on his own side, until the situation was such as that he could pass, if necessary, in safety, within the purview of the road legally open to his travel, and he should only have encroached upon the other side in passing when his observation of the road at the time would have assured him of the safety of others in doing so. In the exigency of a busy street traffic, where people have to cross or station themselves to catch street cars, they are more or less compelled to take some risks which might be regarded on occasion as remote negligence in timing distance to enable them to pass before onrushing automobiles; but if they can reasonably do this, and can reach a place at which the law and traffic regulations undertake to guard them from danger from an unauthorized quarter, they should not be held as responsible, in suffering injury from such quarter in the bullet-like contact of an automobile, driven by one in total disregard of either the law or propriety, which seems to have been this case. Whether the jury credited his theory or the other, in either case there was gross negligence, in which this woman was struck on the side of the street at which the defendant was not authorized to be without negligence, and from which she was not required to anticipate his appearance.

The assignments are without merit. They are all overruled and the judgment of the lower court affirmed, with costs against appellants.

Portrum and Thompson, JJ., concur.